IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

A.P. MOLLER-MAERSK A/S, TRADING§
AS MAERSK LINE,                 §
                                §
            Plaintiff,          §
VS.                             §     Civ. A. H-13-1726
                                §     Admiralty - Rule 9(h)
SAFEWATER LINES (1) PVT, LTD.,  §
SAMRAT CONTAINER LINES, INC.    §
and ATNI, INC.,                 §
                                §
            Defendants.         §

## <u>OPINION AND ORDER OF SUMMARY JUDGMENT</u>

Pending before the Court, in the above referenced action in admiralty, is a motion for summary judgment (#67) under Federal Rule of Civil Procedure 56, filed by Plaintiff A.P. Moller-Maersk A/S, Trading as Maersk Line ("Maersk"), based on its contract claims against Defendant Samrat Container Lines, Inc. ("Samrat"). Currently this lawsuit, grounded in admiralty (28 U.S.C. § 1333(1)) and/or diversity (28 U.S.C. § 1332(a)(2)) jurisdiction over Maersk, a Danish corporation, and Samrat, a New Jersey corporation, with its principal place of business in Piscataway, New Jersey. Maersk asserts claims for contractual indemnity and breach of governing contract(s) of carriage, and contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") against Samrat.

Initially after a cargo of hydrochloric acid was allegedly improperly packed in overfilled drums and incorrectly stowed aboard

-1-

vessels by M/S Global Multichem and carried across the ocean, Maersk filed this action to force all the original Defendants to take delivery of a cargo of hydrochloric acid, shipped under a Maersk bill of lading from Pipavav, India to Houston, where it was found on offloading that the plastic totes in Container Numbers MSKU368505-9, POCU064333-3, and UXXU241719-9 were leaking the acid. Maersk has since settled with and dismissed all the Defendants other than the Samrat (i.e., #34, ATNI, Inc., intended to be the ultimate receiver, and #45, Safewater Lines (I) Pvt., Ltd. and Safewater Lines (India) Pvt, Ltd., which booked the containers for the voyage to Houston under a Service Contract with Maersk and issued at least one of the bills of lading in issue). Given that Defendants were jointly and severally liable under various contracts,[1] in the remaining portion of this lawsuit under Maersk's bill of lading terms and conditions[2] and tariff,[3] Maersk seeks to

---

[1] Maersk and Safewater Lines (I) Pvt., Ltd. and Safewater Lines (India) Pvt, Ltd. entered into Service Contract No. 516551, while the bills of lading with their terms and contracts imposed joint and several liability on Samrat as consignee and Party to Notify.

*Black's Law Dictionary* (West 1990) defines "joint and several liability as "[d]escrib[ing] the liability of copromisors of the same performance when each of them, individually, has a duty of fully performing the obligation, and the obligee can sue all or any of them upon breach of performance."

[2] All three bills of lading in dispute have the same terms and conditions. Attachment 2 to Ex. A.

[3] The regulations of the Federal Maritime Commission define "tariff" as

-2-

recover    from    Samrat[4]    its    share[5]    of    the

_____

> a publication containing actual rates, charges, classifications, rules, regulations, and practices of a carrier or conferences of carriers for transportation by water.  For purposes of this tariff circular, the term "practices" refers to those usages, customs or modes of operation which in anywise affect, determine or change a transportation rate, charge or service provided by the carrier and, in the case of conferences, must be restricted to those practices authorized by the basic conference agreement.  46 C.F.R. [§] 536.2.

*Gilbert Imported Hardwoods, Inc. v. 245 Packages of Guatambu Squares, More or Less*, 508 F.2d 1116, 1121, 1975 A.M.C. 912, 919 (5th Cir. 1975).

[4] The Second Amended Complaint, #43 at ¶24, alleges, but Samrat denies, that "Samrat was the freight forwarder, logistics provider, and/or NVOCC [non-vessel operating common carrier] of the subject cargo" and "the consignee of the cargo under the Bills of Lading."  Maersk defines an "NVOCC" as

> a common carrier that does not operate vessels by which the ocean transportation is provided and is a shipper in its relationship with the ocean common carrier. *Tokio Marine & Nichido Fire Inc. Co. v. SOPHIE RICKMERS*, 2011 A.M.C. 2576, 2577 n.3 (S.D. Tex. 2012); 46 U.S.C. § 40102(16).  Courts frequently describe NVOCC's as "intermediaries between a shipper of goods and an operator of a vessel that carries goods.'"  *Id.* (quoting *Axess Int'l Ltd. v. Intercargo Ins. Co.,* 183 F.3d 935, 937 (9th Cir. 1999).

[5] As Maersk explains, #67, p.3 n.8,

> To the extent Maersk settled the tort claims it asserted against ATNI and [the two Safewater Defendants], Samrat, as a non-settling party, has no viable claim in tort against the settling parties. *Combo Maritime, Inc. v. U.S. United Bank Terminal, LLC*, 615 F.3d 599, 603-04 (5th Cir. 2010). . . . To the extent Samrat asserts contract claims against Safewater Defendants, which have settled with Plaintiff, Samrat

resulting expensive emergency clean up costs, freight demurrage,[6] and other expenses arising from the spill of hydrochloric acid from the sealed shipping containers from the time the containers were offloaded in Houston from the M/V MAERSK IDAHO (after free time expired) until the time the hydrochloric acid was abandoned and sold for salvage.[7]

---

is merely entitled to a *pro tanto* reduction for the sums paid by ATNI and [the Samrat Defendants]. *Evanow v. M/V NEPTUNE,* 163 F.3d 1108, 1119 (9th Cir. 1998)("The universal non-admiralty rule is that contract damages are offset pro tanto by the amount of the settlement with a co-obligor. . . . This is simply a manifestation of the rule that a contracting party shall not receive more than was bargained for.").

*See also McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994)("The [*pro tanto*] rule encourages settlements by giving the defendant that settles first an opportunity to pay less than its fair share of the damages, thereby threatening the nonsettling defendant with the prospect of paying more than its fair share of the loss."

[6] "Demurrage is a charge for delay after free time has expired and is an accepted form of liquidated damages in shipping. *Ocean Transp. Line v. Am. Philippine Fiber Ind., Inc.*,743 F.2d 85, 90 (2d Cir. 1984)." #67, p.2, n.3. "Because demurrage is established by the parties' shipping contract, bill of lading and applicable tariff, courts routinely enforce these charges as contract terms. *Mediterranean Shipping Co. (USA), Inc. v. Cargo Agents, Inc.*, No. 10 Civ. 5070(THK), 2011 WL 62888422, at *3 (S.D.N.Y. Dec. 15, 2011)." *Id.*

[7] Maersk explains that the generally double stacked totes in the original twenty-foot containers that arrived in Houston were offloaded from the containers because of leaking or believed-to-be-leaking acid and repackaged into new totes and then singly stacked into different forty-foot containers so the initial containers could be cleaned and repaired. Thus Maersk seeks demurrage for the new containers into which the acid was transferred. #67, p. 2, n.4.

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on

which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for

the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991). The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences

-7-

from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13. The Court may not make credibility determinations. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009), *citing Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007).

### *Factual Allegations of Maersk's Second Amended Complaint (#43)*

Prior to the shipment of the allegedly improperly packaged, overfilled, and incorrectly stowed drums of hydrochloric acid from Pipava, India to Houston, Texas, Safewater Lines (I) Pvt., Ltd. and Safewater Lines (India) Pvt. (also referred to as "Safewater Defendants" or "Safewater entities"), and Maersk entered into Service Contract No. 516551 (the "Service Contract"), which established preferred rates for the carriage of marine cargo to Safewater Lines (I) Pvt., Ltd., Safewater Lines (India) Pvt., and their affiliates. The Service Contract indicated that the carriage of goods and other services provided to Maersk under the Service Contract were subject to the terms and conditions of the Maersk bill(s) of lading governing the carriage of the cargo,[8] as well as

---

[8] Clause 1 of the terms and conditions of the bills of lading defines "carriage" as "the whole or any part of the cargo," including loading and unloading, storing, warehousing, handling and any other services whatsoever undertaken by the Carrier in relation to the Goods. "Carrier" is defined as Maersk (Plaintiff). "Goods" is defined as "all or any part of the cargo accepted from the Shipper." Ex. A, Attachment 2, clause 1.

the applicable tariff(s).

At issue in this case are three M/S Global Multichem ("Multichem") invoices, 102 dated January 12, 2012, 105 dated January 27, 2012, and 106 dated February 9, 2012, respectively, for the sale of the hydrochloric acid. Maersk alleges that upon information and belief, the manufacturer of the acid was Nirma, Limited, the exporter was Multichem, and the ultimate receiver was ATNI in Midland, Texas. The invoices demonstrate that the acid was carried by vessel from India to Houston, for final delivery to ATNI in Midland, Texas.

It was Multichem, as an agent for Defendants or an agent acting on Multichem's behalf, who stowed the acid in drums, which were then stowed in Plaintiff-owned Container Numbers MSKU368505-9, POCU064333-3, UXXU241719-9, and PONU754670-3 (the "containers") and sealed for the ocean carriage. The Safewater entities booked the containers for shipment under the Service Contract and assigned them Booking Numbers 863338433, 863444274, and 863494073. They also issued bills of lading for the acid (at least bill of lading SELDEL0133f2 sold under invoice 102) that states "SHIPPER LOAD STOW COUNT & CUSTOMS SEAL").

Before loading, the containers were tendered to Maersk at Pipavav, India, and accepted by Maersk, which issued Bills of Lading Nos. MAEU863338433, MAEU863444274, and MAEU863494073 ("Bills of Lading"), naming Safewater Lines (I) Pvt., Ltd. and Safewater

Lines (India) Pvt. as the shipper and SAMRAT as the consignee, all expressly subject to the Maersk Terms & Conditions of Carriage. All Defendants are "Merchants" under ¶1 of the Terms and Conditions of the bill of lading: "includes the Shipper, Holder, Consignee, Receiver of Goods, and Person owning or entitled to the possession of the Goods or of this bill of lading and anyone acting on behalf of such Person." Amendment 2 to Ex. A attached at clause 1. Clause 3 states, "The Merchant warrants that in agreeing to the Terms and Conditions hereof he is, or has the authority to contract on behalf of, the Person owning or entitled to possession of the Goods and this bill of lading." Containers MSKU368505-9 and POCU064333-3 were loaded onto M/V Maersk Kampala (Voyage 1204) in Pipavav, India on or about February 28, 2012 for carriage to Houston, while on or about March 8, 2012 container PONU754670-3 was loaded on the M/V HANJIN DALLAS (Voyage 1204) also in Pipavav for carriage to Houston on the M/V Maersk IDAHO. When the vessels arrived at the Port of Houston on or about April 13, 2012, the containers were purportedly leaking hydrochloric acid, except in the case of UXXU241719-9, the container was suspected of leaking because acid had leaked onto the container. When the containers were opened, the drums were found to have leaked the acid because they were overfilled, were nonconforming, unapproved, and therefore inadequate for carriage of hydrochloric acid.

Maersk immediately tried to stop the leakage and clean up the

spilled acid, hiring a local hazardous materials specialist to help clean up the spill and repack the drums. Some of the drums were transloaded from one container to another, at significant expense to Maersk.

Defendants rejected the cargo at the Houston APM terminal and refused to pay for any cleanup costs, freight, demurrage, and other costs that Maersk necessarily incurred as a result of the leakage. Ultimately Maersk sold the hydrochloric acid to the highest bidder at a salvage sale and received $550 for it.

Because at all pertinent times Defendants were allegedly the freight forwarders, logistics providers, non-vessel operating common carriers ("NVOCCs"), manufacturers, receivers and/or shippers of the cargo, they were responsible for proper packaging and marking of the cargo and/or for the hydrochloric acid owned by each after the arrival of the containers in Houston. Individually and/or jointly they negligently failed to comply with the numerous regulations in Chapter 49 of the Code of Federal Regulations regarding the packaging of hazardous materials to be shipped by an ocean carrier to the United States. That negligence triggers liability without fault and liability based on negligence and or negligence per se for the total amount of damages, currently at least $243,775.03, incurred by Maersk as a result of the failure to comply with those regulations.

As for the breach of the governing contract(s) of carriage

claim, Defendants allegedly tendered cargo that was insufficiently packaged to withstand the regular hardships and dangers of ocean carriage, failed to comply with international standards for the packaging and shipment of hazardous materials, and failed to pay the agreed freight and other expenses of shipment and refused to accept delivery of their goods. Therefore, insists Maersk, each Defendant is jointly and severally liable for the damages, costs and expenses of at least $243,775.03, arising from these failings and must indemnify Maersk for them under the terms of the applicable bills of lading. *See* Maersk Terms & Conditions, Clauses ("CLS.") 11[9] and 15,[10] available at www.maerskline.com.

---

[9] Clause 11 states in relevant part,

If the container has not been packed by the Carrier:

11.1 This bill of lading shall be a receipt only for such a container;

11.2 The Carrier shall not be liable for loss of or damage to the contents and the Merchant shall indemnify the Carrier against any injury, loss, damage, liability, or expense whatsoever incurred by the Carrier if such loss of or damage to the contents and/or injury, loss, damage, liability, or expense has been caused by any matter beyond his control, including, inter alia, without prejudice to the generality of this exclusion:

(a) the manner in which the Container has been packed; or

(b) the unsuitability of the Goods for carriage in Containers; or

(c) the unsuitability or defective condition of the Container . . . .

Maersk further asserts that Multichem, on behalf of itself and each of the other Defendants, executed a statutory declaration for hazardous cargo in the Multimodal Dangerous Goods Form for the cargo in dispute, certifying that the drums of hydrochloric acid were properly packaged, marked, labeled/placarded, and otherwise fit for transport per the applicable international and national government regulations.  Defendants warranted that under the contract of carriage that the cargo was packed to survive the typical dangers of carriage and complied with all applicable laws

Ex. A, Attachment 2, CLS. 11.

[10] CLS. 15 provides in relevant part,

15.1 All of the Persons coming within the definition of Merchant in clause 1 shall be jointly and severally liable to the Carrier for the due fulfillment of all obligations undertaken by the Merchant in this bill of lading.

15.2  The Merchant shall be liable for and shall indemnify the Carrier against all loss, damage, delay, fines, attorney fees and/or expenses arising from any breach of any warranties in clause 14.3 or elsewhere in this bill of lading and from any other cause whatsoever in connection with the Goods for which the Carrier is not responsible. . . .

15.4  If Containers supplied by or on behalf of the Carrier are unpacked by or for the Merchant, the Merchant is responsible for returning the empty Containers, with interiors clean, odour free and in the same condition as received, to the point and place of designation by the Carrier, within the time prescribed. Should a Container not be returned in the condition required and/or within the time prescribed in the Tariff, the Merchant shall be liable for any detention, loss or expense incurred as a result thereof.

and regulations.  Allegedly the statutory declaration was false and Defendants breached their warranty under the contract of carriage, so each is jointly and severally liable for damages, costs, and expenses in the amount of at least $243,775.03, arising from the inadequate packaging, including but not limited to the costs of emergency spill cleanup response and demurrage, and must indemnify Maersk for that amount.  *See* Maersk Terms & Conditions, Cls. 21, including Cls. 21.2 and 21.3.[11]

---

[11] CLS. 21 states in relevant part regarding carriage of dangerous goods such as hydrochloric acid:

. . . .

21.2  The Merchant warrants that such Goods are packed in a manner adequate to withstand the risks of Carriage having regard to their nature and in compliance with all laws, regulations or requirements  which may be applicable to the Carriage; and

21.3  The Merchant shall indemnify the Carrier against all claims, liabilities, loss damage, delay, costs, fines and/or expenses arising in consequence of the Carriage of such Goods, and/or arising from breach of any of the warranties in clause 21.2 . . . .

Clause 22 states,

. . . .

22.2  The Merchant shall take delivery of the Goods within the time provided for in the Carrier's applicable Tariff.  If the Merchant fails to do so, the Carrier may without notice unpack the Goods if packed in containers and/or store the Goods ashore, afloat, in the open or under cover at the sole risk of the Merchant.  Such storage shall constitute due delivery hereunder, and thereupon all liability whatsoever of the Carrier in respect of the Goods or that part thereof shall cease and the costs of such storage shall forthwith upon demand be paid by the Merchant to the

Regarding Maersk's final claim for contribution under CERCLA, 42 U.S.C. §§ 9601 *et seq.*, Maersk, which did not fill the drums of acid nor stuff the containers, insists it has no liability for the cleanup, but is entitled to seek full contribution from potentially responsible parties, including Samrat (identified as the consignee and Notify Party named on the Maersk bills of lading), the Safewater entities (which had a Service Contract with Maersk under which the acid cargo was booked, for which Maersk issued the bills of lading, and which were the Shippers listed on the bills of lading), and ATNI, Inc. (the owner, receiver, and/or ultimate consignee of the acid cargo shipped under the Maersk bills of lading). On page 12 of #43 Maersk identifies the different costs and expenses owing, but indicates they are not limited to those on the list. In addition to costs and expenses now approximating at least $243,775.03, Maersk seeks prejudgment and postjudgment interest, costs, and attorney's fees.

### *Maersk's Motion for Summary Judgment against Samrat (#67)*

Maersk identifies as the issue here "[w]hether, under the terms and conditions of the subject bills of lading and the applicable law, Maersk is entitled to summary judgment against

---

Carrier.

22.3  If the Carrier is obliged to discharge the Goods into the hands of any customs, port or other authority, such discharge shall constitute due delivery of the Goods to the Merchant under this bill of lading.

Samrat on its contractual indemnity and breach of contract claims?"[12] Maersk's conclusion is that "Samrat is liable to Maersk under alleged contracts for all of the damages Maersk incurred as a result of or in connection with the spilled or suspected spillage of [hydrochloric acid] from the involved containers and bills of lading." #67 at p.14.

Samrat, the named consignee (receiver) because Samrat was acting as the Safewater Defendants' U.S. Agent for cargoes that were being imported to the United States, and as notify party on each of the three bills of lading in dispute, concedes that it is the agent of the two Safewater Defendants, named as the shipper on the bills of lading, for shipments including the ones here from India to the Port of Houston. A critical fact is that these bills of lading do not state or indicate in any way that Samrat is acting in an agency capacity and as the named consignee that would have informed Maersk that Samrat was acting in an agency capacity or as an agent for a disclosed principal. Samrat is therefore an undisclosed agent, and as such, and as a "Merchant" as defined by the terms of the bills of lading, is liable to Maersk under the bill of lading terms and conditions by way of indemnity and through

---

[12] Maersk does not seek summary judgment on the Second Amended Complaint's negligence claims or fault-based liability, nor does it seek summary judgment under CERCLA. #80, Maersk's Reply, at p.2. Thus Samrat's arguments about its lack of wrongdoing, lack of fault, and CERCLA responsible parties are irrelevant to the motion for summary judgment and to the concept of joint and several liability.

its contractual obligations for all expenses incurred by Maersk to clean up the leaking hydrochloric acid, costs to unload the totes/drums of the acid to determine what was leaking and the extent of the program, costs to load the totes/drums of leaking or overfilled acid into new totes, and then reload all of the totes into new containers, demurrage expenses for repairs to the containers, costs, interest and attorney's fees.

Under their contractual agency arrangement, Safewater Defendants would act as the NVOCC, which would issue a bill of lading direct to its customer. Next, Safewater Defendants would place the shipment with an ocean carrier, here Maersk, who would then issue its own bill of lading identifying the Safewater entities as the shipper and Samrat as the consignee. Next Safewater Defendants would transmit the Master bills of lading to Samrat, which, as consignee, would provide them to the ocean carrier Maersk to collect the cargoes. After delivery, Samrat would make the necessary arrangements to transport and deliver the cargoes to the ultimate consignee, ATNI.

In the instant case, before shipment of the subject cargoes, the Safewater Defendants and Maersk entered into Service Contract Number 516551 (Attachment 15 to Ex. A), which set preferred freight rates for the carriage of marine cargo to the Safewater Defendants and its affiliates and which referenced each of the involved bills of lading (Attachment 1 to Ex. A, in the upper right hand corner on

the fourth line). The Service Contract designated the Safewater entities as an NVOCC under 46 C.F.R. § 530.6 and named the Safewater entities as the shipper on each Maersk bill of lading (Attachment 1 to Ex. A).

In January 2012, Safewater Defendants contacted Maersk to book five twenty-foot containers for ocean carriage from India to Houston. The transactions were booked under the Service Contract and given Booking Numbers 863338433 and 863333490 (Attachment 4 to Ex. B). These containers were loaded by someone other than Maersk and tendered to Maersk at Pipavav, India for shipment to Houston, Texas. Maersk accepted them and issued Bill of Lading Numbers MAEU863338433, MAEU 843444274, and MAEU863494073 (Ex. A, 16), expressly subject to the Maersk Terms & Conditions of Carriage, and naming the Safewater Defendants as the Shipper and Samrat as the consignee and thus a "Merchant" under the bill of lading terms and conditions, as well as the notify party. They are called the Master bills of lading.

On or about February 28, 2012, containers MSKU368505-9 and POCU0643333-3 were loaded on the M/V MAERSK KAMPALA (Voyage 12) in Pipavav, India for transport to Houston. On or about March 7, 2012 container PONU 754670-3 was loaded on board the M/V HANJIN DALLAS (Voyage 1204) in Pipavav, India for carriage to Houston. All referenced containers were shipped to Houston on board a third ship, the M/V MAERSK IDAHO.

On April 13, 2012 after the ships arrived at the APM Terminal at the Port of Houston, Containers MSKU368505-9 and POCU0643333-3 were discovered to be leaking acid, and in the case of UXXU241719-9, suspected of leaking acid, because acid was found on or under the container that had actually leaked from another container (Ex. C, ¶¶ 6-8). The U.S. Coast Guard and the Port of Houston Fire Department requested Maersk to immediately contain any additional leakage and cleanup that which spilled in the containers and onto the pavement. (Ex. C, ¶¶ 6-8).

Maersk timely notified all known interested parties of the situation, kept them apprised of the cleanup efforts by email and telephone conferences, and made numerous demands under the bill of lading Terms and Conditions for those interested parties to pay sums owing and due before the cargo could be picked up, and requested that they come to retrieve the cargo. Attempting to resolve the dispute, Maersk several times offered discounts, but Defendants, including Samrat, rejected the offers and abandoned the cargo. Maersk then issued a Notice of Abandonment and ultimately was forced to sell the cargo of hydrochloric gas to the highest bidder at a salvage sale for $550.00 net. Maersk then filed this lawsuit to recover its losses.

Maersk insists that it is entitled to summary judgment against Samrat for all of the damages Maersk incurred as a result of the alleged spillage or suspected spillage of hydrochloric acid from

the discussed containers and bills of lading.  Maersk carried containerized cargo pursuant to a standardized bill of lading contract that includes the particulars of that shipment and the terms and conditions that govern the relationship between the parties.  In this action Maersk issued three such bills of lading with the same terms and conditions (MAEU MAEU863338433, MAEU 843444274, and MAEU863494073 (Ex. A,  16)), which list Samrat as the consignee and notify party, and as a "Merchant" as defined in Clause 1.  As  a named consignee, Samrat is a party to the bill of lading and is bound by the bill of lading terms and conditions.  As a party to and Merchant under the bills of lading, Samrat is jointly and severally liable to Maersk for the expenses Maersk incurred to clean up the acid spill, for demurrage, and for attorney's fees, pursuant to bill of lading clauses 3,11,15,16.7, 21, and 22.  These bill of lading clauses, read together, make Samrat liable to Maersk for breach of bills of lading.  *APL Co. Pte Ltd. v. Blue Water Shipping U.S., Inc.*, 779 F. Supp. 2d 358, 367-68 (S.D.N.Y. 2011).

The bills of lading here are maritime contracts because their main purpose was to succeed in transporting goods by sea from a port in a foreign country to one in the United States.  *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004); *Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273, 277 (2d Cir. 2000)(bill of lading for ocean carriage is a maritime contract).  Maritime contracts are

"construed like any other contracts by their terms and consistent with the intent of the parties" by common law principles of contract interpretation. *Norfolk*, 543 U.S. at 31; *Nippon Yusen Kaisha v. FIL Lines USA, Inc.*, 977 F. Supp. 2d 343, 558-59 (S.D.N.Y. 2013). Thus the bills of lading at issue naming Samrat as consignee with the terms and conditions stating that the consignee on a bill of lading is a Merchant that is jointly and severally liable to Maersk and shall indemnify Maersk against all loss, damage, delay, fines, attorney's fees and/or other expenses arising from any breach of any of the warranties in the bill of lading and from any other cause whatsoever in connection with the Goods for which the Carrier is not responsible, together convey an unambiguous and definite meaning and are not reasonably susceptible to competing interpretations.

Furthermore there is precedent for binding a named consignee to the bill of lading where it is shown that the consignee accepted the bill of lading or that an agency relationship between the consignee and one of the parties to the bill of lading. *Vimar Seguros y Reaseguros v. M/V SKY REEFER,* 515 U.S. 528 (1995); *All Pac. Trading, Inc. v. M/V HANJIN YOSU,* 7 F.3d 1427 (9th Cir. 1993); *FIL Lines*, 2014 A.M.C. at 559-60; *In re Rickmers* Genoa Litig., 622 F. Supp. 56, 72 (S.D.N.Y. 2009), *citing Taisheng Int'l Ltd. v. Eagle Maritime Services, Inc*., No. Civ. A. H.-05-1920, 2006 WL

846380, at *4-5 (S.D. Tex. Mar. 30, 2008).[13]

Under the law of agency, an agent for an undisclosed principal is liable for breach of contract "just as though he was the principal." *Orient Mid-East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572, 575 (2d Cir. 1072), *quoting Restatement (Second) Agency* §§ 4, 321; *CMA-CGM (Canada), Inc. v. World Shippers Consultants,*

---

[13] As the Honorable Sim Lake opined in *Taisheng*, 2006 WL 846380, at *4-5,

> A consignee to a bill of lading may also be bound to the bill of lading under agency principles. Federal maritime law embraces the principles of agency. *West India Industries, Inc. v. Vance & Sons AMC-Jeep*, 671 F.2d 1384, 1387 (5th Cir. 1982). The general rule is that where a consignee purchases merchandise from a seller and authorizes the seller to ship the goods, the seller as shipper or consignor is the consignee's agent for the purpose of shipping. 1-2 Saul Sorkin, Goods in Transit § 201[8] (2005). The shipper or consignor is impliedly authorized to enter into the usual and customary transportation contract with the carrier and the consignee is bound by such terms. *See United States v. M/V Santa Clara I*, 887 F. Supp. 825, 836 (D.S.C. 1995)("Contracts or bills of lading on which a party is named as consignee bind the party to the agreement"). *See also Jockey Int'l v. M/V "Leverkusen Express,"* 217 F. Supp. 2d 447, 456-57 (S.D.N.Y. 2002)(holding that a consignee is bound by a forum selection clause in the bill of lading when the bill of lading was issued to an intermediary who acted as the consignee's agent in arranging the shipment).
>
> To bind a nonsignatory consignee to the bill of lading, there must be an agency relationship between the consignee and the shipper. *See Nebraska Wine & Spirits , Inc. v. Burlington N.R. Co.*, [No. 91-0103-CV-W-2,] 1992 WL 328938 [*2-3](W.D. Mo. 1992). An agency relationship can be established on actual authority, apparent authority, or estoppel. *Wells Fargo Business Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944-46 (5th Cir. 1982).

*Ltd.*, 921 F. Supp. 2d 1, 6-7 (E.D.N.Y. 2013). "To avoid such liability, the agent must disclose the identity of his principal 'at or before the time when the contractual agreement is made final.'" *CMA-CGM*, 921 F. Supp. 2d at 7, *quoting Orient Mid-East*, 458 F.2d at 576. "[T]he law imposes no general duty on a party to a contract to undertake research to learn the identity of an otherwise undisclosed principal." *Id.* at 7. Just because a party in a shipping arrangement is known to be acting on behalf of others does not impose a duty on the ocean carrier, like Maersk, to discover the identity of the party on whose behalf the first party acts. *Orient Mid East*, 458 F.2d at 576.

Maersk analogizes the situation here with that in *FIL Lines*, 2014 A.M.C. at 553, 559, where the ocean carrier was granted summary judgment against the named consignee on the bill of lading on the ocean carrier's breach of contract claim for monies owed on the bill of lading. Under the bill of lading terms and conditions, the consignee, as a defined Merchant, was jointly and severally liable to the carrier for the payment of all freight an charges and for the performance of other obligations under the bills of lading. *Inc.* at 560-61. The court rejected FIL's argument that it was an agent acting for a disclosed principal so it could not be held liable as an agent. It found no language in the bills of lading that indicated FIL was acting as an agent. *Id.* at 562. Agency law rules that if the fact of agency fails to appear in the contract,

an agent who appears to be a party thereto cannot submit extrinsic evidence to demonstrate that the company is not a party to the integrated contract. *Id.* at 561 ("If the fact of agency does not appear in an integrated contract, an agent who appears to be a party thereto can not introduce extrinsic evidence to show that he is not a party"), *citing Restatement (Second) of Agency* § 323(3). Here, too, nothing in the three bills of lading indicates to Maersk that Samrat was acting "on behalf of" or "as an agent for" another party, so Samrat cannot introduce extrinsic evidence to show that Samrat was not a party to the contract. Thus Samrat, as the named consignee on the bills of lading, is a party to those bills and as a matter of law is bound there under agency principles. This material fact, established as a matter of law, allows Maersk to prevail on summary judgment against Samrat.

As consignee on the bills of lading bound to the bill of lading terms and conditions under agency principles, Samrat is jointly and severally liable to Maersk for its obligations and responsibilities under the bill of lading terms and conditions. Here, Samrat as consignee and as Merchant by bill of lading definition (clauses 1,3,11,15,16.7,21 and 22) is also jointly and severally liable to Maersk for the damages sought by Maersk. Because Maersk did not pack the containers and did not fill the totes, clause 11 requires Samrat to indemnify Maersk of any injury, loss, damage, liability or expense incurred by Maersk. Clause 15

makes Samrat jointly and severally liable to fulfill all obligations undertaken by the Merchant and to indemnify Maersk for all loss damage, delay, fines, attorney fees and/or expenses arising from any breach of any of the warranties [in clause 21, including warranties that dangerous goods like hydrochloric acid are packed in a manner adequate to withstand the risks of carriage and in compliance with all laws, regulations or requirements applicable to the carriage] in the bill of lading and from any other cause whatsoever in connection with the Goods for which Maersk is not responsible. Instead of compliance, the hydrochloric acid was not properly packed in totes that were overfilled with lids that were loose so it could not withstand the risks of carriage. Declaration of Brian Koeper (marine surveyor and general manager of CTS Limited marine surveyors in Houston, Texas ("CTS"), hired by Maersk to investigate the leaking containers), Ex. C, ¶¶ 6-8 and attached photographs). Under clause 16.7 of the bill of lading terms and conditions, Samrat as a Merchant is responsible to Maersk to pay unpaid demurrage. Under clause 21 Samrat is liable to Maersk to indemnify Maersk for all claims, liabilities, loss, damage, delay, costs, fines and/or expenses arising from the carriage of these Goods and/or arising from breach of any of the warranties in clause 21.1. Finally, Samrat as Merchant breached clause 22 by failing to take possession of the Goods, so Maersk was forced to repackage the goods and store them until abandonment when

negotiations broke down.  The contract required Maersk to sell the acid for salvage.  Maersk received $550.00 net from the sale.

Im sum, Maersk claims it is entitled to recover its damages minus the $550.00 obtained in the salvage sale in the total amount of $194,325.03, as evidenced by the supporting documents to #67, from Samrat, which is jointly and severally liable to Maersk as a Merchant.  It then discusses its damages in detail, citing clauses 1,3,11,15,16.7,21 and 22 as establishing that Samrat is liable to Maersk in contract and by way of contractual indemnity to Maersk for Maersk's loss, injury, damage, fees, delays, expenses, demurrage, costs, liabilities, and attorney fees incurred by Maersk resulting from or in connection with the containers leaking hydrochloric acid or suspected of leaking hydrochloric acid. #67 at pp. 20-21.  Under the terms of the bill of lading, Samrat, ATNI, and the Safewater Defendants are jointly and severally liable to Maersk for damages incurred by Maersk, plus costs, interest and attorney's fees.  Maersk previously settled with ATNI and the Safewater Defendants for a combined sum of damages in the amount of $60,000.00.  Thus Maersk is entitled to a judgment against Samrat in the amount of $133,775.03 ($193,775.03 minus the $60,000.00 paid by the other Defendants), plus pre- and post-judgment interest as allowed by law, costs of court, and attorney's fees under the bill of lading terms and conditions, and now makes a request for them. Under Local Rule 54.2, Maersk shall file its application for costs

and attorney's fees within fourteen days of the entry of a final judgment.

## Samrat's Opposition (#78)

Claiming that Maersk seeks summary judgment for alleged wrongdoing that was in actuality the responsibility of defaulted crossclaim Defendants Safewater Lines (1) Pvt. Ltd. and Safewater Lines (India) Pvt., Ltd., now that Maersk settled with the other Defendants in the main action, it seeks to recover additional amounts from Samrat, which at most was "passively involved" in the shipment. Instead the shipment was effected under the service contract between Maersk and the Safewater Defendants, to which Samrat was not a party. Indeed Samrat insists it was not a party to any contract with Maersk and only acted as an agent of the Safewater Defendants for the agreement between Maersk and the Safewater Defendants. Affidavit of Mr. Satish V. Anchan, President of Samrat, #78-1, ¶4. Nor did Samrat ever authorize any entity to designate Samrat as consignee of any of the shipments. Samrat was named the consignee of the cargo in dispute in Houston, but it did not load the cargo, tender it in India to Maersk, and did not handle any of the cargo nor enter into any agreement with Maersk regarding the cargo's loading or shipment. Maersk has settled with the Safewater Defendants for $60,000, less than it demanded in its pleadings. That fact does not mean that Samrat is responsible for making up the balance of Maersk's claimed losses of $133.775.03 in

damages, based on the contractual relationship between Maersk and Samrat, as pleaded in Maersk's Second Amended Complaint (#43 at ¶12). Default judgment was granted to Samrat on the crossclaim by Samrat against the Safewater Defendants (#49, #75).

Samrat disagrees that the bills of lading constitute a contractual relationship between Maersk and Samrat and quotes from *Sucrest Corp. v. M/V Jennifer*, 455 F. Supp. 371, 389 n.16 (D. Me. 1978):

> Where, as in the present case, the charterer holds the bill of lading, it is equally well settled that the bill of lading serves merely as a receipt for the cargo and does not function as the contract for the carriage of the goods.

Furthermore it is generally held that bills of lading do not impose liability on a consignee like Samrat in the manner that an actual contract might. Instead, as expressed in *W. Home Transp., Inc. v. Hexco*, *LLC*, 28 F. Supp. 3d 959, 963-64 (D.N.D. 2014), bills of lading served only as a receipt for the subject cargo:

> A bill of lading is a commercial document that may be used for several purposes. It may serve as a document of title for the transported goods. It may function as receipt evidencing the transfer of possession of the goods from the shipper/consignor to the carrier, including documenting the kind and quantity of the goods and, in some instances, their condition. Finally, and more importantly here, the bill of lading is usually the basic transportation document between a shipper (who is often but not always the consignor) and the carrier and, absent something more, is the primary contract between the two. *See generally* 1-2 *Goods in Transit* § 2.01 (LexisNexis 2014)("*Goods in Transit*"). The liability of the consignee designated in a bill of lading is a much more complicated subject and is not necessarily governed by the bill of lading. *See generally* 4-22 *Goods in*

*Transit* § 22.03-22.04.

Samrat does acknowledge the maritime rule that a consignee can be bound to a bill of lading terms and conditions by acceptance and through an agency relationship. According to Samrat, the two primary methods for binding an intended beneficiary to a bill of lading are by (1) showing that a third party agreed to be bound and (2) having an agency relationship with one of the contracting parties; "absent such a showing, contractual obligations cannot be imposed on an intended beneficiary." *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2009). Maersk has failed to submit any evidence that Samrat's actions "exhibited acceptance to be [] bound" by the bill of lading, nor legal or factual support for the proposition that the bill of lading somehow imposes contractual liability on Samrat for the Safewater Defendants' obligations to Maersk regarding the acid cargo.[14]

Maersk contends that Samrat has long admitted to the agency prong and that it "accepted" the bill of lading terms and conditions by exercising control over the cargoes and holding them until all expenses were paid. *Pacific Coast Fruit Dist. v. Pennsylvania Railroad Co.*, 217 F.2d 273, 274 (9th Cir.

---

[14] In *Hexco* the consignor had agreed to pay the freight charges and the consignee had not. Contrary to Samrat's charges, Maersk maintains that *Hexco* does not stand for the proposition that the bills of lading in the instant suit are merely a receipt for goods and therefore Samrat is not liable as a named consignee.

1954)(consignee is bound to the bill of lading terms and conditions when it exercises control over the cargo). Samrat also argued that the Safewater Defendants were at fault and therefore liable, not Samrat, mainly because Safewater Defendants had the Service Contract with Maersk and because Samrat did not handle the cargoes. As discussed, the bills of lading terms and conditions make all parties who qualify as "Merchants" under their terms jointly and severally liable for breaches of those terms and conditions and under the bill of lading contractual indemnity clauses. Maersk's suit seeks to enforce those provisions. The Safewater Defendants settled with Maersk before Samrat filed its cross-claim. On the contract claims Samrat is entitled to a *pro tanto* reduction of its portion to the $60,000 the Safewater Defendants' settlement with Maersk.

As for Maersk's negligence claims, which is not part of its motion for summary judgment, Samrat has no claim against the Safewater Defendants under maritime law because, as a non-settling tortfeasor, it has no claim against a settling tortfeasor. *Combo Maritime*, 615 F.3d at 603-04 (In *Boca Grande Club, Inc. v. Fla. Power & Light Co.*, 511 U.S. 222, 222 (1994), the Supreme Court held that in admiralty action when one defendant settles its claim before trial with the plaintiff, "'actions for contribution against settling defendants are neither necessary nor permitted," *citing AmClyde*, 511 U.S. at 202 (adopting proportionate share rule that in

-30-

admiralty cases the liability of non-settling defendants should be calculated with reference to the jury's allocation of proportionate responsibility for plaintiff's injuries, not by giving non-settling defendants credit for the dollar amount of settlement, i.e., without regard to the amount of the settling defendant's settlement)).

Maersk states that it settled with all the Defendants other than Samrat for $60,000 (#67 at p. 26) and claims that Samrat now owes it $133,775.03, based on the contractual relationship between Maersk and Samrat that Maersk pleaded in its Second Amended Complaint (#43, ¶12) and on Samrat's crossclaim against the Safewater Defendants (#49, ¶¶ 7 and 8). Samrat maintains that the Safewater Defendants are liable for any remaining damages that Maersk seeks to recover from Samrat.

Samrat also argues that appropriate equitable factors indicate that the Safewater Defendants should bear the all damages ("response costs") for their contribution under CERCLA, 42 U.S.C. § 9613 if any damages are alleged.

In sum, the Safewater Defendants, not Samrat, are the ones involved in the underlying transactions with Maersk for which Maersk seeks damages. Samrat was the consignee of the cargo in Houston, but it did not load the cargo, tender it in India to Maersk, did not do anything to contribute to the loss Maersk alleges. In contrast the Safewater Defendants provided in India

the containers to be loaded with the acid, and they had the direct contractual relationship with Maersk. An established principle in admiralty law is that the party who has the duty for loading, stowing or discharging of cargo is ultimately responsible for the cargo. 174 *Benedict on Admiralty* 17-19 (7th ed. 2005), *citing Coastal States Petrochemical Co. v. Montpelier Tanker Co.,* 1970 A.M.C. 1183 (S.D. Tex. 1970)(Tanker owner not liable for discoloration of gasoline cargo where under a typewritten clause the charterer assumed responsibility and risk of cleaning tanker); *North Am. Steel Products Corp. v. Andros Mentor*, 1969 A.M.C. 1482 (S.D.N.Y. 1967)(Where voyage charter shifted responsibility for loading to charterer, the latter had no claim against the vessel for cargo damages resulting from improper loading methods; owner's liability would only attach if there was a lack of due diligence in making the vessel seaworthy.). If Samrat is in any way liable to Maersk, the Safewater Defendants are liable to Samrat for the entire amount under Samrat's crossclaim (#49, ¶¶ 7 and 8).

### Maersk's Reply (#80)

Emphasizing that its motion for summary judgment is based only on breach of contract and contractual indemnity, Maersk reiterates that its initial claims for negligence, fault-based liability, and CERCLA contribution are irrelevant to its motion for summary judgment. Maersk contends that Samrat, which admitted that it is an agent of the Safewater Defendants to handle cargoes going to the

United States and which exercised control over the subject cargoes by informing Maersk not to deliver the cargoes to the ultimate receiver (here, ATNI) until all expenses were paid, is bound by the Maersk bill of lading terms and conditions as a Merchant, and is jointly and severally liable to Maersk for Maersk's damages. Maersk highlights the fact that Samrat does not challenge the content of the bill of lading terms and conditions as discussed and applied to the facts here by Maersk. Samrat simply argues that it is not a party to any contract with Maersk, although Samrat concedes by the affidavit of Mr. Satish Anchan that Samrat would serve as the Safewater Defendants' United States agent, would aid them with freight prepaid and freight collect cargoes shipped by them to the United States, and that the agency agreement was in effect during the relevant time period. #78-1 at ¶3.

Samrat argues that the cargoes were shipped pursuant to the Service Contract between Maersk & the Safewater Defendants. Samrat is not named as an affiliate or a named account on the Service Contract and is not a party to it. According to the statutory definition, 46 U.S.C. § 40102(20), "Service Contract" is "a written contract, other than a bill of lading or receipt, between one or more shippers, on the one hand, and an individual ocean common carrier . . . in which–

> (A) the shipper or shippers commit to providing a certain volume or portion of cargo over a fixed time period; and

> (B) the ocean common carrier or the agreement
> commits to a certain rate schedule and a
> defined service level, such as assured space,
> transit time, port rotation, or similar
> service features.

The Service Contract does not list terms and conditions for the shipments contemplated by the Service Contract. The Maersk/Safewater Service Contract explicitly states that Carriage and other service provided pursuant or in relation to the Service Contract are subject to the terms, conditions and provisions of the governing carrier transport document, i.e., the bill of lading. #67-13 at p.2. Samrat erroneously says or implies that the cargoes of hydrochloric acid were carried only pursuant to the Service Contract. Maersk insists that under the Service Contract, the carriage of their goods was bound to the bills of lading issued by Maersk and the terms and conditions for those bills of lading. *Id.* Thus because of what joint and several liability allows, Maersk seeks to apply the bill of lading terms and conditions to Samrat, as discussed in its motion.

Samrat's statements that it cannot be liable to Maersk as an undisclosed agent on behalf of the Safewater Defendants are not only unsupported, but are undermined by the fact that Maersk was in receipt of bills of lading that specifically identified Safewater as the shipper and Samrat as the named consignee, #67, Ex. A, exh. 1. The bills of lading do not state "as agent for" or "on behalf of" by Samrat's name. As a matter of law Maersk has no

obligation to discover the identity of an undisclosed principal,
nor does the fact that a party to a shipping arrangement is known
to act on behalf of others impose a duty on an ocean carrier like
Maersk to identify the party on whose behalf the first party acts.
*Orient Mid-East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572, 576
(2d Cir. 1972). Usually, "one who acts as an agent does not become
personally bound on a contract which he makes for a disclosed
principal; but if he fails to divulge the name of his principal, he
does become a party to the contract." *Id.* at 575-76. Furthermore,
the agent must disclose the identity of the principal at or before
the time when the contractual agreement is made final. *Id.* at 575.
Here that was not done, so Samrat is an agent for an undisclosed
principal and a party to the contract. *See Nippon Yusen Kaisha v.
FIL Lines USA Inc.,* 2014 A.M.C. 553, 561-63 (S.D.N.Y. 2013). As
named consignee, Samrat was acting as the U.S. Agent of the
Safewater Defendants on the bills of lading. *See* #78-1, ¶3
affidavit of Satish Anchan ("Anil Malik, Director of Safewater
Lines India PVT Ltd ("Safewater India" and I, as President of
Samrat, orally agreed that Samrat would serve as Safewater's U.S.
agent. Pursuant to the agreement, Samrat would assist Safewater
India with both Freight Prepaid and Freight Collect ocean cargoes
shipped by Safewater India into the U.S. bu ocean common carriers.
That agreement was in effect from 2008 until mid-2013."); *see id.*,
¶6 ("Specifically, Samrat was named as the consignee (receiver) of

the cargo in Houston in the Master Bill of Lading issued by Maersk

at the instruction of Safewater.").

Samrat attempts to restrict the relevance of the Maersk bills

of lading terms and conditions by calling them simply "receipts."

Maersk maintains that each of the bills of lading terms and

conditions in this case is also a contract of carriage,[15] while the

_____

[15] The Court concludes that Maersk is correct as a matter of
law. The Second Circuit in *Berisford Metals Corp. v. S/S
Salvador,* 779 F.2d 841, 845 (2d Cir. 1985), *cert. denied*, 476
U.S. 1188 (1986), described the significance and various
functions of the bill of lading in maritime trade as

> a fundamental and vital pillar of international trade
> and commerce, indispensable to the conduct and
> financing of business involving the sale and
> transportation of goods between parties located at a
> distance from one another. It constitutes an
> acknowledgment by a carrier that it has received the
> described goods for shipment. It is also a contract of
> carriage. As a document of title it controls the goods
> themselves. *See Gilmore and Black, The Law of
> Admiralty*, Ch. III, § 3-1, p. 93 (2d ed. 1975). It has
> been said that the bill and the goods become one and
> the same, with the goods being "locked up in the bill."
> *Id.* at 96. As the court stated in *Pollard v. Reardon*,
> 65 F. 848, 852 (1st Cir. 1985),

>> "In the developments of commerce and
>> commercial credits the bill of lading has
>> come to represent the property, but with
>> greater facility of negotiation, transfer,
>> and delivery than the property itself. . . .
>> And it has become so universal and necessary
>> a factor in mercantile credits that the law
>> should make good what the bill of lading thus
>> holds out. There is every reason found in
>> the law of equitable estoppel and in sound
>> public policy for holding, and no injustice
>> is involved in holding, that, if one of two
>> must suffer, it should be he who voluntarily
>> puts out of his hands an assignable bill of

Service Contract is not a contract of carriage. The cases Samrat cites are private carriage cases in which the charter party is the contract of carriage.[16] But in the instant suit there is no charter party. Morever the cases cited by Samrat do not apply under the facts here. In *Sucrest*, 455 F. Supp. 371, the cargo owner and the charterer of the ship sued the ship and its owner for cargo damage and other expenses. The court ruled that where the charterer (Sucrest) held the bill of lading, the bill of lading serves as a receipt for the goods and governs the relationship between the parties unless that charterer specifically adopts the bills of lading as regulating the rights of the parties. Because the instant action has no charter party, *Sucrest* in not applicable.

Only the bills of lading constitute a contract that potentially can be applied to Samrat, as the entity named the consignee in the bills of lading, insists Maersk. Samrat cites to *Hexco*, 28 F. Supp. 3d at 964, to argue that bills of lading do not impose liability on a consignee. Maersk, however, points out that

---

> lading, rather that he who innocently
> advances value thereon."

[16] Maersk note that there are different rules for private carriage, which is where only one party's goods are shipped on the vessel at issue, and common carriage, where more than a single party's goods are shipped on the vessel at issue, which is always the case for containerized shipments like those in the instant case. The cases cited by Samrat are for private carriage and do not apply to the common carriage performed by Maersk for Defendants here.

*Hexco* is not a maritime case to which maritime legal principles apply, and it dealt with the issue whether the consignee had looked only to the consignor for payment of freight charges.

## Court's Decision

After a careful review of the applicable contracts and the law, the Court agrees with Maersk that it is entitled to summary judgment against Defendant Samrat on its breach of contract and contractual indemnity claims for the reasons it states. As with Maersk's claims for all loss, damage, delay, fines and other expenses, Samrat is jointly and severally liable for Maersk's attorney's fees. #67, Ex. A, Attachment 2, clause 15.2. (terms and conditions of bill of lading).

The Court

Orders Maersk to file an appropriate motion for attorneys' fees under the bill of lading within twenty days with supporting evidence. Samrat shall file a timely response. The Court also

ORDERS Maersk to file a proposed final judgment at the same time.

SIGNED at Houston, Texas, this  23rd  day of  August , 2017.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE